**UNITED STATES of America, Plaintiff,**

v.

**Robert BURNETT, Defendant.**

**Criminal Action No. 02–20075–01–CM.**

United States District Court, D. Kansas.

Dec. 16, 2002.

Sheri Peterson McCracken, Kansas City, KS, for United States of America.

Ross C. Nigro, Jr., Fox, Partee & Nigro, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Pending before the court is defendant's Motion to Suppress Physical Evidence and Statements Obtained in Violation of the Fourth and Fifth Amendments (Doc. 16). Defendant requests the court to suppress all evidence the police seized from his vehicle on July 12, 2002, including 78.1 grams of crack cocaine and $2,745 in cash, as well

as all statements the defendant made after the police searched his vehicle.

Specifically, defendant contends that Officer Mitch Clark of the Olathe Police Department unreasonably seized him in violation of the Fourth Amendment when he questioned defendant beyond the scope of that which is necessary to establish defendant's authority to operate the vehicle and to conduct a criminal background check. Defendant also claims that Officer Clark's continued detention of defendant while awaiting the arrival of a canine unit was an unreasonable seizure in violation of his Fourth Amendment rights. Defendant further argues that, because his vehicle was not legitimately detained, a subsequent canine sniff of the vehicle was an unreasonable search impermissible under the Fourth Amendment. In addition, defendant states that the officer's search of his vehicle after the canine alerted to the presence of narcotics was an unreasonable search in violation of the Fourth Amendment, because the officer handling the dog triggered it to alert to the presence of narcotics, thus tainting the search. Finally, defendant argues that the search following the canine alert was unsupported by probable cause, because the government had not established that the dog had the proper training required for a valid search.

As set forth below, defendant's motion is denied.

### ● Factual Background

### ● Initial Observation

On the evening of July 12, 2002, Officer Clark surveyed the Villager Inn at 211 North Rawhide, near the intersection of Interstate 35 and Santa Fe in Olathe, Kansas. At approximately 10:25 p.m., Officer Clark observed a red four-door car enter the Villager Inn parking lot and stop for approximately two minutes before leaving. Officer Clark saw that there was one person in the vehicle. In addition, he observed a person walking away from the vehicle during the time that it was stopped. At the suppression hearing, Officer Clark testified that the Olathe Police Department had made several drug-related arrests at the Villager Inn, and that it was believed to be an area with a high volume of narcotics trafficking. He further testified that officers frequently watch for vehicles making short stops in motel parking lots, because they believe that such conduct often indicates narcotics trafficking.

### ● Vehicle Stop

Officer Clark followed the vehicle until it failed to stop at a stop sign at the intersection of Santa Fe and Rawhide. At 10:30 p.m., Officer Clark then activated his emergency equipment and pulled the vehicle over. Officer Clark testified that, based upon the conduct he had observed in the Villager Inn parking lot, he became suspicious that the driver was involved in narcotics trafficking. Officer Clark stated that, prior to the time he stopped the vehicle for failing to observe the stop sign, he had determined that, based upon the conduct he observed in the Villager Inn parking lot, he was going to ask for consent to search the vehicle or, if he could not obtain the driver's consent, that he would call a canine handler.

Officer Clark approached the vehicle and introduced himself to the driver, Robert Burnett. Officer Clark noted that defendant was "immaculately dressed" in red plaid pants, a white long-sleeved shirt, a red vest, numerous large gold diamond rings, and several gold necklaces. Officer Clark also observed a green sticker on the rear bumper of the vehicle indicating it had been rented from Enterprise Leasing. Officer Clark testified that in his experi-

ence, he had observed that narcotics traffickers often used rental vehicles.

After he requested defendant's driver's license and defendant produced it, Officer Clark returned to his vehicle to run a records check via the National Crime Information Center (NCIC) and Alert, a metro-area information system. The checks revealed that defendant had been released from the Kansas State Penitentiary for the sale of narcotics. Officer Clark then requested a back-up unit. Officer Skiles responded momentarily. Officer Clark then requested defendant to exit the vehicle and stand behind it. Officer Clark returned defendant's driver's license to him after defendant had exited the vehicle. However, Officer Clark stated at the suppression hearing that defendant was not free to leave at that time.

Officer Clark explained to defendant why he had stopped him. After the officer asked defendant where he was going, defendant indicated he was visiting a girl at Monroe Circle, approximately two miles away. Officer Clark decided not to issue a traffic citation to defendant, but instead gave him a verbal warning.

### • Questioning Pursuant to Field Interview Contact

Officer Clark testified that, because defendant had prior contact with the Department of Corrections, the Olathe Police Department's policy required him to fill out a report called a Field Interview Contact (FIC). The FIC requested a physical description of an individual, including dress, scars, marks, tattoos, a description of the vehicle, the individual's address, driver's license information, gang affiliation, and school or employment information. According to Officer Clark, the Kansas Department of Corrections directed officers to complete the FIC. Officer Clark described defendant's demeanor during the FIC interview as being very laid-back.

Pursuant to the FIC, Officer Clark asked defendant questions about his tattoos, including one depicting the Chinese symbol for money. Officer Clark asked defendant if he had made money with drugs, and defendant answered in the affirmative. After Officer Clark asked defendant what he had been dealing, defendant stated he had been dealing cocaine. Officer Clark also asked defendant about a second tattoo, which stated something to the effect that a "gangsta" never retires. Defendant explained he got that tattoo to remind him "not to return to that lifestyle."

Officer Clark also asked for the rental agreement for the vehicle, which defendant produced. Officer Clark also asked defendant whether he was employed, and defendant responded that he was unemployed, but occasionally helped his parents operate a day care center.

After Officer Clark inquired why defendant had entered the Villager Inn parking lot for such a brief period of time, defendant stated that he had become lost and that he usually went to his destination via a different exit off Interstate 35. Officer Clark then explained to defendant that he had become suspicious of drug trafficking activity after he observed defendant's vehicle stop briefly in the parking lot, because such behavior was consistent with drug activity the officer had observed on previous occasions. Defendant assured Officer Clark that he was not "in the business."

Next, Officer Clark asked defendant whether there were any drugs in the vehicle. After defendant replied in the negative, Officer Clark asked for his consent to search. Officer Clark stated in his police report that he requested consent based upon his observations including the vehicle's short stop at the motel; the defendant's wearing of a "large amount of expensive jewelry" that defendant told the

officer was real; that defendant did not appear to have any steady employment, which would be necessary to support his lifestyle; and the defendant's admission that he had been a dealer who sold cocaine. Defendant declined to consent, stating that he knew his rights and that the police had no right to search his vehicle during a routine traffic stop. At that point, at 10:43 p.m., Officer Clark requested a canine unit.

Officer Clark stated that defendant never requested to leave. On cross-examination, Officer Clark admitted that defendant stated he had been delayed from going to visit his girlfriend and had made "some indication" that he wanted to leave. Defendant told Officer Clark he believed his rights were being violated. Officer Clark asked defendant whether he had any weapons. Defendant responded by turning his back to the officer and raising his arms to shoulder height, which Officer Clark understood to mean a nonverbal response of consent to be patted down. Officer Clark conducted a pat down, and told defendant he was not under arrest. Officer Clark located a tube of Chapstick in defendant's front pocket, removed it with defendant's consent, and returned it to defendant. Officers Clark and Skiles asked defendant whether he was going to visit the same woman whose name appeared on the vehicle rental agreement, and defendant replied that he was going to visit a different woman instead. Officer Skiles asked defendant whether one of the rings he was wearing was real, and defendant replied in the affirmative. The officers asked defendant why his vehicle was rented, and defendant explained it was rented because his girlfriend's car was in the shop.

## A. Suspicion of Illegal Activity

Officer Clark testified that, before he stopped the defendant, he suspected the defendant was engaged in drug trafficking activities. Officer Clark stated he first became suspicious when he observed the vehicle stop briefly in the parking lot of a motel believed to be a frequent site for drug trafficking. According to Officer Clark, the vehicle's action in stopping briefly in a parking lot of an area where drug trafficking is believed to take place was conduct that, in his experience, is consistent with drug trafficking. Officer Clark further related that the actions he observed were inconsistent with innocent conduct because there were many other locations nearby, such as gas stations, that were open at the time where a person who was simply lost could have stopped to ask directions or consult a map.

Further, Officer Clark stated the information he learned from the defendant during the stop reinforced his suspicions of illegal activity. Specifically, Officer Clark cited the facts that defendant was driving a rental vehicle; wearing a "large amount of expensive jewelry" that defendant told the officer was real; did not appear to have any steady employment, "which would be necessary to support his lifestyle." Officer Clark stated he did not believe defendant's statement that he was unemployed, because Officer Clark reasoned that a person who was unemployed would have been unable to afford a rental vehicle and the style of dress and jewelry that he had been wearing. In addition, Officer Clark stated that his suspicions grew when defendant admitted that he had been a dealer who sold cocaine in the past.

## ● K–9 Unit Arrives

The responding canine handler, Officer Falcon, arrived at approximately 10:52 p.m. Officer Clark explained to defendant that the dog was trained both to sniff for the presence of drugs and to bite an individual if necessary. Officer Clark stated he explained this to defendant so that he

would not become nervous and make a sudden movement that would cause the dog to react. The dog alerted to the driver's side door. Officer Falcon then placed the dog inside the vehicle. After the dog alerted to the center console of the vehicle, Officer Clark entered the vehicle in order to search inside the center console. Officer Clark then discovered loose cash and a Crown Royal cloth bag. Officer Clark stated that a Crown Royal cloth bag was commonly used to transport narcotics. Officer Clark then opened the bag, and found approximately fifty individually packaged rocks of what appeared to be crack cocaine. Officer Clark then informed defendant he was under arrest. Defendant proceeded to run approximately ten feet before Officers Clark and Skiles were able to corner the defendant and place him under arrest. Officer Clark conducted a further search of the vehicle and located, in the trunk, several packages of money wrapped in rubber bands. The officer then seized the cash, the Crown Royal bag, and the narcotic substance that was found in the vehicle. Officer Clark testified that, until defendant had attempted to flee, defendant had been cooperative and polite throughout the entire encounter.

● **Analysis**

The court turns to the merits of defendant's claims. Defendant contends that Officer Clark's actions in questioning him constituted an unreasonable seizure, because Officer Clark asked questions beyond those necessary to establish (1) whether defendant had authority to operate the vehicle, and (2) to check the defendant's criminal background. Defendant also argues that Officer Clark unreasonably seized him by telling him he had to remain until a canine unit arrived, and that the interval of time before the canine unit arrived was unreasonable. Further, defendant alleges that because his vehicle

was not reasonably seized, the canine sniff constituted an unreasonable search. Defendant claims that the search of his vehicle after the canine alerted to the presence of narcotics was unsupported by probable cause and therefore unreasonable, in violation of the Fourth Amendment, because the officer caused the dog to alert, thus tainting the search. Finally, defendant argues that the search following the canine alert was unsupported by probable cause, because the government had not established that the dog had the proper training.

● **Continued Detention and Questioning While Awaiting Arrival of Canine Unit**

1. **Legal Standard**

▮▮▮ "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Hunnicutt,* 135 F.3d 1345, 1348 (10th Cir.1998) (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). A routine traffic stop is more analogous to an investigative detention than a custodial arrest. *United States v. Jones,* 44 F.3d 860, 871 (10th Cir.1995), *cited in Hunnicutt,* 135 F.3d at 1348. Accordingly, the court analyzes traffic stops under the principles elucidated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Hunnicutt,* 135 F.3d at 1348. The court must determine the reasonableness of an investigative detention by first asking "whether the officer's action was justified at its inception," and second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868).

▮▮▮ Upon initiating a routine traffic stop, an officer may request a driver's

license and vehicle registration, run a computer check, and issue a citation. *Id.* (citing *United States v. Gonzalez-Lerma,* 14 F.3d 1479 (10th Cir.1994)). The investigative detention "usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" *Id.* (citing *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). "Once the driver produces a valid license and proof that she is entitled to operate the car, the driver must be permitted to proceed." *Jones,* 44 F.3d at 872 (citing *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988)).

■ However, an officer may lengthen the detention for further questioning beyond that which is related to the initial stop in two circumstances: "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." *Id.* (citing *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993) and *Gonzalez–Lerma,* 14 F.3d at 1483). "In the first situation a Fourth Amendment seizure has taken place, but it is reasonable and consequently constitutional. In the second there is no seizure, and hence the Fourth Amendment's strictures are not implicated. But if neither of those factors is present, evidence derived from further questioning (or, a fortiori, from an ensuing search) is impermissibly tainted in Fourth Amendment terms." *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994). Here, the government does not argue that the stop was consensual. Accordingly, the court must consider whether the first rationale for continued detention is satisfied.

■ The Supreme Court recently observed that "[b]ecause the 'balance between the public interest and the individual's right to personal security,' tilts in favor of a standard less than probable cause" in investigative detentions conducted pursuant to *Terry v. Ohio,* "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion that criminal activity 'may be afoot.'" *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citations omitted). In determining the existence of a objectively reasonable suspicion of illegal activity, the court must examine the totality of the circumstances. *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Bloom,* 975 F.2d 1447, 1456 (10th Cir. 1992). The court must employ common sense and "ordinary human experience," and should accord deference to "a law enforcement officer's ability to distinguish between innocent and suspicious actions." *United States v. Wood,* 106 F.3d 942, 946 (10th Cir.1997) (citations omitted). Reasonable suspicion cannot be based upon inchoate suspicions or unparticularized hunches. *Id.* (citing *United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir.1994)).

### 2. Objective Reasonableness of Officer Clark's Suspicion

■ Officer Clark testified at the suppression hearing that he suspected defendant was engaged in illegal drug trafficking based upon defendant's brief stop in the parking lot of a motel at which the police department had made several drug arrests in the past. Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," the Supreme Court has noted that "officers are not required to ignore the relevant characteristics of a location in

determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Consequently, a court may consider the fact of a defendant's presence in a "high crime area" in analyzing whether an officer had an objectively reasonable suspicion under *Terry*. *Id.*

■ A driver's brief stop in a hotel parking lot certainly may be consistent with several innocent explanations, such as being lost. In formulating reasonable suspicion, however, officers are permitted "to draw[ ] inferences and make[ ] deductions ... that might well elude an untrained person." *United States v. Moore*, 22 F.3d 241, 243 (10th Cir.1994) (citation omitted).

Defendant emphasizes that the circumstances of his stop did not involve many factors courts have identified as indicia giving rise to an objectively reasonable suspicion of illegal activity. Specifically, defendant points out that Officer Clark's testimony stated that defendant exhibited no nervousness, was able to provide a driver's license and proof of his ability to operate the vehicle, had credible travel plans, and was cooperative during the stop. *Cf. Hunnicutt*, 135 F.3d at 1349 (noting that an individual's lack of proof of authority to operate vehicle, inconsistent statements about destination, driving with a suspended license, and reluctance to stop are factors supporting objectively reasonable suspicion of illegal activity).

However, the court notes that, although the factors enumerated by defendant have been held to support an objectively reasonable suspicion of criminal activity, the *absence* of such factors does not mean that an officer cannot form such a suspicion. Further, as discussed above, observation of conduct that an officer has found to be consistent with criminal activity in the past, located in an area where criminal activity has taken place, is a factor that may support an objectively reasonable suspicion of criminal activity.

Defendant cites *United States v. Walker*, 933 F.2d 812 (10th Cir.1991) for the proposition that Officer Clark's continued questioning of the defendant resulted in an unlawful seizure. In *Walker*, the Tenth Circuit affirmed the district court's order granting the defendant's motion to suppress, concluding that an officer's continued detention of a defendant during a traffic stop in order to ask him intrusive questions unrelated to the traffic stop violated the defendant's Fourth Amendment rights, when such questioning was not supported by an objectively reasonable suspicion of criminal activity. *Id.* at 814. Specifically, the court found that the officer's questioning of defendant regarding whether there were any weapons, open containers of alcohol, or controlled substances or paraphernalia in the vehicle, while at the same time the officer continued to hold the defendant's driver's license and registration, constituted an unreasonable seizure under the Fourth Amendment, because the detention "was not reasonably related to the circumstances that justified the interference in the first place," *i.e.*, the officer's traffic stop of defendant for speeding. *Id.*

The court finds that *Walker* is distinguishable from the case at bar, because Officer Clark testified that he suspected defendant was involved in criminal activity prior to the time he stopped the defendant's vehicle and commenced questioning. In contrast, the *Walker* court stated that the officer presented no testimony indicating that he suspected the defendant had been involved in criminal activity. *Id.* Further, the *Walker* court found that the district court did not err in concluding that the officer stated an insufficient basis for an objectively reasonable suspicion of criminal activity. *Id.* at 817. In particu-

lar, the Tenth Circuit noted that although the officer indicated that he had observed that defendant appeared nervous during the stop and that defendant's hands shook, the officer did not testify that these observations caused him to suspect that the defendant was involved in criminal activity. *Id.*

Officer Clark, unlike the police officer in *Walker*, articulated at the suppression hearing factors that caused him to suspect that defendant was involved in illegal drug trafficking prior to the time he began questioning defendant on matters unrelated to the traffic stop.[1] Specifically, Officer Clark stated that the fact that defendant had made a brief stop in a location that the department believed was a frequent location for drug trafficking and that he observed an individual walking away from the vehicle caused him to become suspicious.

■ Given the totality of the circumstances, the court finds that Officer Clark acted reasonably in detaining defendant to ask additional questions unrelated to the traffic stop. Based upon Officer Clark's testimony that the defendant's conduct he had observed in the parking lot was consistent with drug trafficking that he and other officers had encountered in the past, the court finds that the government has demonstrated that Officer Clark had an objectively reasonable basis for suspecting that the defendant was engaged in narcotics trafficking. Accordingly, Officer Clark's continued detention and questioning of de-

fendant was not an unreasonable seizure in violation of the Fourth Amendment.

● **Reasonableness of Continued Detention Awaiting Arrival of Canine Unit**

■ The court also finds that the amount of time that elapsed between the officer's initial stop of defendant and the time at which the canine unit arrived, twenty-two minutes, is well within the boundaries of a time period the Tenth Circuit has determined to have been a reasonable time for a defendant to be detained while awaiting a canine unit. *See United States v. Villa–Chaparro*, 115 F.3d 797, 802–03 (10th Cir.1997) (finding that a forty-eight minute detention was not an unreasonable length of detention awaiting canine unit). Accordingly, the court finds that Officer Clark's detention of the defendant while he waited for the canine unit to arrive was not unreasonable under the Fourth Amendment.

■ Defendant's vehicle was therefore lawfully seized at the time the canine sniff was conducted. Because a canine sniff is not a search within the meaning of the Fourth Amendment, no individualized reasonable suspicion of drug-related criminal activity is required for a canine sniff of a lawfully seized vehicle. *United States v. Morales–Zamora*, 914 F.2d 200, 203 (10th Cir.1990). Accordingly, the court finds that, because defendant's vehicle was lawfully seized based upon Officer Clark's objectively reasonable suspicion of criminal

---

1. Had Officer Clark been unable to articulate an objectively reasonable suspicion of criminal activity, the court would have, in light of *Walker* and other authority, been troubled by the breadth of the questioning in which Officer Clark engaged pursuant to the Field Investigative Contact form. The government has not cited, nor has the court located of its own accord, any legal authority for the proposition that an officer may ask an individual about his employment status, gang affiliation, and tattoos based solely upon a check of NCIC which reveals the individual has had contact with the prison system. However, the court does not reach the issue of the constitutionality of such questions, because the court finds a sufficient showing that Officer Clark developed an objectively reasonable suspicion of criminal activity prior to making contact with the vehicle driven by defendant.

activity, the canine sniff of the vehicle did not constitute an unreasonable search in violation of the Fourth Amendment.

### B. Improper Use of Canine

#### 1. Officer's Alleged Inducement of Canine to Alert

 Defendant contends Officer Falcon improperly caused the canine to alert to the presence of narcotics when, at first, the canine registered no response. Consequently, defendant argues, the officers' ensuing search of the vehicle was unsupported by probable cause, because the canine alert was invalid. Once a properly trained canine alerts to the presence of narcotics, law enforcement officers have probable cause to conduct a full search of a vehicle. *United States v. Massie*, 65 F.3d 843, 849 (10th Cir.1995). Once they have obtained probable cause to search, the officers need not obtain a warrant in order for a search to be reasonable under the "vehicle exception" to the warrant requirement. *Morales–Zamora*, 914 F.2d at 205–06.

 Defendant claims Officer Falcon jerked on the dog's collar in order to get him to respond. At the suppression hearing, Officer Falcon testified he did not jerk the dog's collar back himself. Officer Falcon stated that the dog exhibited a distinct change in behavior when it reached the driver's side of the car, and that the dog jerked back on the leash. Given the lack of evidence to the contrary, and finding the officer's testimony to be credible, the court finds that Officer Falcon did not improperly influence the dog to alert to the presence of narcotics. Consequently, the officers developed probable cause to search the vehicle for the presence of narcotics, and the search was reasonable under the Fourth Amendment.

#### 2. Training of Canine

In his motion to suppress, defendant claimed that government had not shown that the officers had probable cause to search, because the government had not yet offered evidence that the police dog had been properly certified. At the suppression hearing, the government presented detailed testimony from Officer Falcon regarding the dog's training in drug detection and his high rate of reliability in correctly alerting to the presence of narcotics. The court finds that such testimony was credible and, given the lack of evidence to the contrary, the court determines that the government has established that the canine was properly trained. Accordingly, the canine's alert formed a valid basis for the officers' probable cause to search defendant's vehicle for the presence of narcotics.

### • Conclusion

The court finds that Officer Clark's continued detention and questioning of defendant regarding matters unrelated to the traffic stop was not an unreasonable seizure under the Fourth Amendment. The court also finds that Officer Clark's continued detention of defendant awaiting the arrival of a canine unit was not an unreasonable seizure. Because defendant was lawfully seized at the time of the canine sniff, the court finds that the canine sniff was not an unreasonable search under the Fourth Amendment. The court also concludes that the officers' search of defendant's vehicle after the canine alerted to the presence of narcotics was supported by probable cause, and was therefore reasonable. Finally, the court finds the government has put forth sufficient evidence to indicate that the canine was properly trained in drug detection and, consequently, that the canine's alert to the presence of narcotics was a sufficient basis for the officers to form probable cause to search the vehicle. Because the court finds that defendant's Fourth Amendment right to be free from unreasonable searches and

seizures was not violated, the court denies defendant's Motion to Suppress.

## III. Order

**IT IS THEREFORE ORDERED** that the defendant's Motion to Suppress (Doc. 16) is denied.